## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **KANTRIA CURRY,** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **v.** | * | **Civil No. JFM-05-1220** |
| | * | |
| **MARYLAND CORRECTIONAL** | * | |
| **INSTITUTION-JESSUP, et al.,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |
| | ***** | |

## MEMORANDUM

Plaintiff Kantria Curry ("Curry"), an African-American female, brings this employment discrimination action against defendant, the Maryland Correctional Institution-Jessup (the "State"), alleging disparate treatment based on gender (Count I); hostile work environment (Count II); and retaliation (Count III) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. (Third Am. Compl. ¶¶ 76-109.)[1] Discovery has been completed, and the State now moves to dismiss or, in the alternative, for summary judgment. Curry opposes the motion. For the reasons stated below, the State's motion is treated as a motion for summary judgment, and is granted with respect to all counts.

---

[1] Upon motion of the State, I previously granted a motion to dismiss with regards to Counts I-IV of Curry's Second Amended Complaint, at the same time granting Curry leave to file a Third Amended Complaint. (Order of Dec. 29, 2006 [Dkt. 47].)

# I. Facts

## A. 2000 Termination

Curry began her employment as a correctional officer with the Maryland Department of Public Safety and Correctional Services, Division of Correction, on October 14, 1999, and was assigned to the Maryland Correctional Institution-Jessup ("MCI-J"), located in Jessup, Maryland. (Third Am. Compl. ¶ 14A, Ex. 1 at 4.) On January 14, 2000, Curry filed a complaint with the warden of MCI-J, alleging sexual harassment by a lieutenant whom she claimed unjustly disciplined her after she had spurned his advances. (Third Am. Compl. ¶ 4.) Curry alleges that, as a consequence of her complaint, she was "harassed and retaliated against on the basis of her gender" in the months that followed. (*Id*.)

On October 3, 2000, Curry was told that she was being terminated on probation. (Third Am. Compl., Ex. 1 at 1.) On February 12, 2001, Curry filed a charge alleging sex discrimination, hostile work environment, and retaliation with the Maryland Commission on Human Relations (the "MCHR") (MCHR 0104-0127) and the Equal Employment Opportunity Commission (the "EEOC") (EEOC No. 12F-2001-00298). (Def.'s Mot. to Dismiss, Ex. 1, Att. A.) The MCHR, after investigating Curry's allegations, issued a written finding of no probable cause on June 10, 2002. (*Id*., Ex. 1, Att. B.) The EEOC adopted the MCHR's findings and issued a right-to-sue letter on September 5, 2002. (*Id*., Ex. 1, Att. C.)

Curry also appealed her termination to the Office of Administrative Hearings (the "OAH"), which reviewed her termination by focusing on the issue of (1) whether Curry had become a permanent employee by the time she was terminated and, if not, (2) whether her termination was unconstitutional under Md. Ann. Code State Pers. & Pens. § 11-103. (Third Am. Compl., Ex. 1 at 2.) In a written decision dated September 22, 2003, the OAH concluded that

2

there was not enough evidence in the record to support an extension of Curry's probation. (*Id.* at 14.) The OAH went on to conclude that Curry's termination had been unconstitutional because there was no "valid, legal basis for terminating [Curry] in light of the lack of any indications of less-than-satisfactory job performance[.]"  (*Id.* at 17.) The OAH reversed Curry's termination and ordered that she be "returned to her former position as a Correctional Officer" and be granted "full back pay and benefits" from the date of her termination. (*Id.* at 19.)

## B. 2004 Reinstatement and Termination

Curry was reinstated at MCI-J on June 7, 2004. (Third Am. Compl. ¶ 39.) On June 8, 2004, Curry was assigned to the mailroom by MCI-J Warden John H. Price ("Warden Price") and had only limited access to MCI-J because she allegedly was not given an employee identification card. (*Id.* ¶ 40.) That same day, after returning from a bathroom break, Curry alleges that she observed Major P. Ford, one of her supervisors who had also been her supervisor before her 2000 termination, "standing near the bathroom door as she exited," and he "rolled his eyes in intimidation" towards Curry and gave Curry a "cold stare." (*Id.*) On June 9, 2004, Curry was sent home for the day on unpaid leave for being in an improper uniform and was informed she would not be given a uniform until she had successfully completed training at a correctional academy. (*Id.*) Curry alleges that she "successfully completed" correctional training at the Maryland Correctional Training Commission (the "MCTC") entry-level academy in Woodstock, Maryland on November 29, 1999. (Third Am. Compl. ¶ 43.)[2]

On June 16, 2004, Curry alleges that Warden Price directed that her paycheck not be released until she signed an agreement to meet with Warden Price and the Assistant Warden

---

[2] The State agrees that when Curry was initially hired she had completed the training. (Def.'s Mot. to Dismiss at 5 n.1.) The State takes the position that because Curry was dismissed from the Correctional Entry-Level Training Program for fighting with another student she was not eligible for certification until she again completed a correctional academy. (*Id.*, Ex. 3, France Aff. ¶ 5, 13.)

regarding discipline. (*Id.* ¶ 41.) That same day, Curry filed an EEOC charge (EEOC No. 120-2004-04454) alleging that MCI-J had engaged in retaliation and created a hostile working environment (Def.'s Mot. to Dismiss, Ex. 1, Att. D.) The EEOC on February 4, 2005 dismissed Curry's charge and issued a right-to-sue notice. (*Id.*, Ex. 1, Att. E.) Curry first filed suit against MCI-J on May 4, 2004. (Compl. of May 4, 2004 [Dkt. 1].)

On June 17, 2004, Curry met with Warden Price and her union representative regarding her termination from state service due to pending criminal assault, burglary, and telephone misuse charges in Baltimore County District Court. (*Id.* ¶ 41; Def.'s Mot. to Dismiss, Ex. 7, Att. C.) The parties eventually agreed that any disciplinary action would be postponed until 30 days after the final disposition of Curry's criminal case on September 28, 2004. (*Id.* ¶ 42.)

On June 22, 2004, Curry was assigned to the MCTC training facility in Sykesville, Maryland. (*Id.* ¶ 43.) On July 28, 2004, Curry complained to her supervisors that another student at the correctional academy, Jaquetta Bradley, was using profane and provocative language, to which Curry had responded in kind. (*Id.* ¶ 44.) Curry was administratively dismissed from the correctional academy on July 28, 2004, based in part on her verbal altercation.[3] (*Id.*) Bradley was also administratively dismissed from the correctional academy that same day. (Def.'s Mot. to Dismiss, Ex. 6, Goldman Aff. ¶ 9.)

Upon returning to MCI-J, Curry on August 20, 2004 requested that she be able to exchange her correctional uniform since the pants on her assigned uniform were too small. (*Id.* ¶ 46.) This request was denied by a Sergeant Brown, and when Curry reported the denial to a

---

[3] According to Lee Goldman, the deputy director of the Maryland Police and Correctional Training Commissions, other reasons given for Curry's dismissal included her "early departure" on July 14, 2004; her absence on June 30, 2004; and her failure to successfully complete practicals in crisis, body search, room search, cell search, and vehicle search. (Def.'s Mot. to Dismiss, Ex. 6, Goldman Aff. ¶ 7.)

Lieutenant Ogbe, she alleges she heard Sergeant Brown state to Lieutenant Ogbe, "I am not kissing her ass," in reference to her. (*Id.*)

On September 28, 2004, Curry received a Probation Before Judgment ("PBJ") for her criminal charge of assault in the second degree (*Id.* ¶ 48.) Curry was found not guilty of her criminal charges of burglary in the fourth degree and telephone misuse through repeat calls, and was placed on unsupervised probation for a period of one year with respect to her PBJ. (Def.'s Mot. to Dismiss, Ex. 7, Att. C.) Curry alleges that Warden Price denied her request to modify her PBJ to be able to carry a weapon while on duty whereas another correctional officer, David Epps, had been permitted such a modification after receiving a PBJ. (*Id.*) Curry alleges that she reiterated and was again denied this request on October 24, 2004. (*Id.* ¶ 50.)

On September 28, 2004, Curry alleges she exited a roll-call and attempted to adjust the uniform sleeve of a male officer and immediately heard a supervisory officer, a Lieutenant Ice, aggressively "yell" out to the male officer to dress himself. (*Id.* ¶ 49.)

On October 27, 2004, Curry and her union representative met with Warden Price and other MCI-J management staff and was informed that she was being placed on paid administrative leave pending termination based on her criminal charges and her verbal altercation with Bradley at the correctional academy. (*Id.* ¶ 51.) On October 29, 2004, in another disciplinary meeting with Warden Price at which Curry's union representative was also present, Curry was informed that she was terminated from employment. (*Id.* ¶ 52.) Curry alleges that another correctional officer, Brandon Johnson, a male correctional officer whom Curry alleges was "on AWOL" and "engaged in several altercations" at the training academy, was neither disciplined nor dismissed from the training academy. (*Id.* ¶ 79.)[4]

---

[4] Records indicate that Johnson was dismissed from the correctional academy on July 16, 2004. (Def.'s Mot. to Dismiss, Ex. 6, Att. A.)

On February 22, 2005, Curry filed a complaint with the MCHR (MCHR 0503-0176)

alleging sex discrimination and retaliation. (Def.'s Mot. to Dismiss, Ex. 1, Att. F.) This

complaint was cross-filed with the EEOC (EEOC No. 12F-2005-00292). (*Id*., Ex. 1, Att. G.) The

EEOC did not open an investigative file on the complaint. (*Id*., Ex. 2.) However, the EEOC did

issue a right-to-sue letter on January 26, 2006, informing Curry that she had 90 days from the

date of issuance to bring suit. (*Id*., Ex. 1, Att. H.) Curry filed a motion for leave to file an

amended complaint on May 11, 2006. (Mot. for Leave to File Am. Compl. of May 11, 2006

[Dkt. 23].)

### C. 2005 Reinstatement

On May 26, 2005, the OAH reversed Curry's October 29, 2004 termination, concluding

that because MCI-J management had "indisputably" learned of the criminal charges against

Curry by June 17, 2004, absent a waiver by Curry, MCI-J management was "obligated to take

any disciplinary [action] based upon those charges no later than July 17, 2004" pursuant to Md.

Code Ann., State Pers. & Pens. § 11-106. (Def.'s Mot. to Dismiss, Ex. 3, Att. B at 7.) The OAH

also concluded that because of "the failure of either party to address the [verbal] altercation

[between Curry and Bradley] . . . it would appear that this was not a distinct ground for

discipline, but was a factor considered by [MCI-J management] to bolster its decision to

terminate [Curry] based upon the facts underlying the criminal charges." (*Id*. at 9 n.2.) The OAH

rescinded Curry's second termination based on this procedural reason and ordered her reinstated

with back pay. (*Id*. at 10.)

Curry was reinstated on October 13, 2005, where she was transferred to the Maryland

Reception, Diagnostic, and Classification Center ("MRDCC"), located in Baltimore, Maryland.

(Third Am. Compl. ¶ 53.) On December 13, 2005, Curry informed the duty lieutenant that she

was experiencing pain in her hands and her index finger had locked in place. (*Id*. ¶ 54.) Curry

requested to go to Concentra, the state medical clinic, but her request was denied by her

supervisors and MRDCC Warden Wendell France ("Warden France"). (*Id*.) Curry went to the

hospital, on her own expense, and was diagnosed with bilateral carpal tunnel syndrome and

ordered to wear splints for a two-week period. (*Id*.) On December 15, 2005, Curry was ordered

to work and was allegedly not permitted to use sick leave. (*Id*. ¶ 56.) That same day, Warden

France placed Curry on administrative leave pending a decision by Mary Ann Saar, Secretary of

Corrections and Public Safety ("Secretary Saar"). (*Id*.) Curry filed her second EEOC charge

(EEOC No. 120-2006-00984) and amended it on December 17, 2005. (*Id*.)[5] On February 24,

2006, Curry received a right-to-sue letter from the EEOC. (*Id*. ¶ 64.)

On January 6, 2006, Warden France wrote Curry a letter in which he stated that Curry

could not return to work as a correctional officer until Curry was certified by the Maryland

Correctional Training Commission. (*Id*. ¶ 57.)[6] On January 16, 2006, Curry requested Warden

France to exempt her from the training requirement. (*Id*. ¶ 59.) Given her previous training

preceding her 2000 termination and the OAH determination that the 2000 termination had been

illegal, Curry argued that "she was within the timeframe to obtain in-service training like any

---

[5] The State claims that this charge was filed on December 21, 2005. (Def.'s Mot. to Dismiss at 10.)

[6] In his January 6, 2006 letter, Warden France explained  that Curry's admission to the Correctional Entrance Level Training Program for recertification was denied based on her prior dismissal and "verbal confrontation" with support staff and the executive director of the Maryland Correctional Training Commission, and he would be contacting other local training academies to seek her recertification. (Def.'s Mot. to Dismiss, Ex. 3, Att. C at 1.)

other" correctional officer of her stature. (*Id.*)[7] Warden France denied the request for in-service

training in a January 17, 2006 letter, as did Secretary Saar in a June 22, 2006 letter. (*Id.*)[8]

On January 23, 2006, Curry submitted a formal internal EEOC complaint via facsimile

with respect to "retaliatory behavior" of her direct supervisor, Captain Iris Veenie ("Captain

Veenie"). (Third Am. Compl. ¶ ¶ 53, 61.) Curry alleges that she had tried to submit the

complaint on January 18, 2006, but had been denied access to the internal EEOC office of

MRDCC by a Major Tobash. (*Id.* ¶ 60.) On January 27, 2006, Curry alleges that Captain Veenie

yelled at Curry and pushed a jail door on her hand as Curry was attempting to open the door. (*Id.*

¶ 62.)

On May 26, 2006, Warden France assigned Curry to the MCTC's entry-level satellite

training academy, located in Hagerstown, Maryland, beginning on June 26, 2006. (*Id.* ¶ 65.) In a

letter sent to Curry from Warden France on that date, Warden France explained that Curry was

being assigned to the Hagerstown, Maryland, training academy because no Baltimore region

training program would admit Curry. (Def.'s Mot. to Dismiss, Ex. 3, Att. D at 1-2.)[9] Curry

---

[7] A certified correctional officer remains certified until separated from employment, no longer meets Maryland Correctional Training Commission ("MCTC") selection standards, or is transferred to another position. Md. Code Regs. 12.10.01.06.B (2)(a)-(c). An individual who is separated for less than three years and receives a provisional appointment at a new or the same correctional unit may be recertified and is not required to again meet entrance level training standards. Md. Code Regs. 12.10.01.07(C)(1). Reappointment after three years requires again meeting entrance level selection standards, including corrections and firearms training. Md. Code Regs. 12.10.01.07(D)(1). If a formerly certified correctional officer is reappointed or reinstated, that individual may be recertified if he or she meets standards that include passing fingerprint checks, a drug screening, firearms training, and an investigation into prior controlled substance abuse. Md. Code Regs. 12.10.01.08 (B). A correctional entity recertifying an individual must provide an update on the individual's background investigation to assure the MCTC that the individual is of good moral character and reputation, emotionally stable, and displays "suitable behavior necessary to perform the duties of the mandated position." Md. Code Regs. 12.10.01.08.D and E; Md. Code Regs.12.10.01.05.A(1)(a)-(c). The correctional entity must also forward "[i]nformation on criminal history and derogatory information" to the MCTC. Md. Code Regs. 12.10.01.08.D.

[8] In the June 22, 2006 letter from Secretary Saar, Curry was informed that she was not eligible for a waiver of the entry-level training requirement because she had "not worked in a mandated position since October 13, 2000." (Def.'s Mot. to Dismiss, Ex. 3, Att. F at 1 (citing Md. Code Regs. 12.19.91.16.C(1)(a)).)

[9] According to the letter from Warden Price, the training programs that declined to admit Curry were: the Correctional Entry Level Training Program in Sykesville, Maryland; the Anne Arundel County Department of Detention Facilities; the Baltimore County Bureau of Corrections; and the Harford County Detention Center. (Def.'s Mot. to Dismiss, Ex. 3, Att. D. at 1-2.)

requested and was denied the use of a state vehicle to attend the training academy. (*Id.*)[10] From

June 26, 2006 through August 1, 2006, Curry attended the training academy. (*Id.* ¶ 66.) Curry

was not reimbursed for her commuting expenses or meals during this time. (*Id.*)[11] On August 1,

2006, the training academy director sent Curry's academy test summary to MRDCC. (*Id.* ¶ 67.)

From August 2006 through December 2006, Curry was again assigned to the MRDCC

mailroom and had restricted access to the institution. (*Id.* ¶ 68.) On October 18, 2006, the

MRDCC personnel director, Mark Wilson, wrote to Curry stating that her application for

correctional officer certification had been returned to MRDCC and the MCTC needed further

information regarding Curry's "positive arrest record." (*Id.* ¶ 69.) Curry alleges she then wrote a

letter to the MCTC and Secretary Saar stating that she had never been officially arrested nor

convicted of any crimes, but did not receive a reply. (*Id.* ¶ 70.) On October 24, 2006, Curry filed

another charge with the EEOC (EEOC No. 531-2006-02498) alleging a hostile work

environment because of having been sent to Hagerstown, Maryland for training, being placed on

restricted duty, and being denied overtime. (Def.'s Mot. to Dismiss, Ex. 1, Att. M.) The EEOC

issued a notice of right-to-sue on February 11, 2007. (*Id.*, Ex. 1, Att. N.)

On November 21, 2006, Curry requested overtime on a post where there was no custody

of inmates. The new warden of MRDCC, Warden Felicia Hinton ("Warden Hinton"), denied the

request for reassignment and overtime. (*Id.* ¶ 71.)

On December 1, 2006, Curry contacted her union attorney, who on December 4, 2006

sent a letter to Patrick Bradley, executive director of the MCTC requesting the status of Curry's

---

[10] In his May 26, 2006 letter informing Curry of her assignment to the training academy in Hagerstown, Maryland, Warden Price wrote: "I have endeavored to give you ample notice of your assignment so that you may make whatever personal and travel arrangements are necessary to ensure your timely attendance and completion of the Academy." (Def.'s Mot. to Dismiss, Ex. 3, Att. D. at 2.)

[11] The State contends that Curry's "commute to her temporary worksite did not qualify her to use a state vehicle." (*Id.*, Ex. 3, France Aff. ¶ 20.)

certification. (*Id.* ¶ 72.) On December 8, 2006, Curry was informed her that certification was approved and would be sent "on or about" December 12, 2006. (*Id.* ¶ 73.) Curry on December 13, 2006 delivered her certification approval notice to the MRDCC personnel department. (*Id.* ¶ 74.) On January 8, 2007, Curry was granted certification to perform full duties as a correctional officer. (*Id.* ¶ 75.)

## II. Discussion

### Standard of Review

Under Rule 12(b)(6), a motion to dismiss should be treated as a motion for summary judgment when the motion to dismiss, or exhibits in the record, present matters outside the nonmoving party's pleadings and the court does not exclude such matters. Fed.R.Civ.P. 12(b)(6). I will treat the State's motion as a motion for summary judgment because it requires me to look beyond the four corners of the complaint. *Holloway v. Porter*, No. JFM-05-3087, 2006 WL 2711516, at *1 (D. Md. Sept. 20, 2006).

A motion for summary judgment is granted under Rule 56 of the Federal Rules of Civil Procedure if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990). Summary judgment is precluded only when there are disputes over the facts that might affect the outcome of the proceedings under the applicable law. Factual disputes that are not relevant or not necessary will not be considered in a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of showing that there is not evidence to support the non-moving party's case, and the moving party must only show an absence of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In response, the non-moving party must show that there is a genuine issue for trial. A court must

decide whether there is a genuine issue for trial, "not . . . weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 242-43.

Title VII prohibits employment discrimination with respect to "compensation, terms, conditions, or privileges of employment" because of an employees race, color, religion, gender, or national origin. 42 U.S.C. § 2000e-2(a)(1). Curry's Title VIII claims will be analyzed under the burden-shifting scheme presented in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The *McDonnell Douglas* analysis requires that a plaintiff first establish a prima facie case for discrimination by a preponderance of the evidence, showing that she (1) is a member of a protected class; (2) was performing her duties satisfactorily; (3) was subjected to an adverse employment action; and (4) the circumstances concerning the adverse employment action inferred discriminatory intent. *Toulan v. DAP Prods., Inc*., No. CCB-05-2254, 2007 WL 172522, *3 (D. Md. January 17, 2007). Summary judgment is proper where the plaintiff is either unable to establish a prima facie case or unable to rebut or show pretext in the defendant's legitimate, non-discriminatory reasons for the challenged employment actions. *Id*. at *4.

### III. Discussion

### 1. 2000 Termination

The State argues that any claims brought in Counts I, II, and III concerning events preceding August 21, 2003 are barred by the statute of limitations given Curry's failure to file suit within 90 days of receiving a right-to-sue letter from the EEOC. (Def.'s Mot. to Dismiss at 1.) In response, Curry argues that the OAH decisions of September 23, 2003 and May 26, 2005 should be given "preclusive effect" and none of her claims should be barred because they are inter-connected. (Pl.'s Resp. in Opp. at 2.)

I find that Curry is time-barred from bringing suit on any claims related to her 2000

termination. A Title VII action must be brought within 90 days of receipt of a right-to-sue letter.

42 U.S.C. § 2000e-5(f)(1). Because Curry filed her motion for leave to file an amended

complaint on May 11, 2006, 105 days after the EEOC issued its right-to-sue letter on January 26,

2006, her claims with respect to this EEOC complaint are time-barred. *See, e.g.*, *Bryant v. Bell*,

288 F.3d 124, 132 n.4 (4th Cir. 2002) (concluding that plaintiff's Title VII sex discrimination

claims for work-related suspension and verbal warning were time-barred because he filed his

complaint outside the ninety-day limitations period).

Curry's argument that the OAH decisions should be given preclusive effect – an

argument for which she provides no persuasive citation to legal or other authority – is not

compelling. As a general matter, administrative decisions are not accorded preclusive effect. *See,*

*e.g.*, *Rao v. County of Fairfax, Va.*, 108 F.3d 42, 44 (4th Cir. 1997); *Rosenfeld v. Dept. of the*

*Army*, 769 F.2d 237, 239 (4th Cir. 1985). In those instances where administrative decisions are

accorded preclusive effect, it is because the administrative review is quasi-judicial in nature. *See,*

*e.g.*, *Layne v. Campbell County Dept. Soc. Servs.*, 939 F.2d 217, 219-20 (4th Cir. 1991)

(preclusive effect given to fact-finding of administrative panel that acted in "judicial capacity").

With regard to Curry's OAH decisions, the September 23, 2003 decision, while arguably quasi-

judicial in nature given the substantive review of Curry's retaliation claim, is not extant in this

court because of Curry's time-barred claims. The May 26, 2005 decision is not to be accorded

preclusive effect because the decision-maker there, in focusing the analysis on the timeliness of

Curry's 2004 termination and the procedures surrounding the termination, did not reach the facts

or substance of Curry's claims. *See Campbell County*, 939 F.2d at 219 (preclusive effect

generally given to decision of state administrative agency that resolved disputed issues of fact).

12

As for Curry's argument that all of her claims are connected, this reasoning fails because, as held by the Supreme Court, the time period in which to file a complaint begins to run from the date of the first alleged incident of discrimination. *See Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. ---, 127 S.Ct. 2162, 2169 (2007) (concluding that female plaintiff plaintiff alleging discriminatory pay "should have filed an EEOC charge within 180 days after each allegedly discriminatory pay decision was made and communicated to her."). Moreover, it is accepted that:

> [d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.' [A plaintiff] can only file a charge to cover discrete acts that 'occurred' within the appropriate time period.

*Lurie v. Meserve*, 214 F. Supp. 2d 546, 551 (D. Md. 2002) (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114 n.7 (2002)). Curry's position that all of her claims are connected, regardless of the time when they occurred, is legally unsupportable.[12]

---

[12] Curry advances a continuing violation theory for allowing her claims with respect to her 2000 termination to proceed, but this theory would only permit claims that pertained to occurrences taking place more than 300 days before Curry filed her EEOC complaint rather than remedy the fact that Curry did not bring suit on these claims in a timely manner. Even looking at the date that Curry filed her amended complaint in error – May 7, 2006 – I observe that this date is 101 days after the issuance of the EEOC's right-to-sue letter pertaining to EEOC No. 12F-2005-00292. (Am. Compl. [Dkt. 22].)

## 2. 2004 Termination

### A. Count I – Disparate Treatment

To establish a disparate treatment claim in a disciplinary context, a plaintiff must show that (1) she is a member of a protected class; (2) she was charged with engaging in prohibited conduct; (3) her conduct was substantially similar to that of employees outside the protected class; and (4) she was punished for that conduct more severely than employees outside the protected class. 42 U.S.C. § 2000e-2(a)(1), (m).

As a basis for her disparate treatment claim, Curry alleges that she was "refused the same terms, conditions, and benefits of her employment unlike male correctional officers similarly situated" between June 2004 and December 2005. (Third Am. Compl. ¶ 78.) Specifically, Curry focuses on the treatment of correctional officer David Epps ("Epps"), whom Curry alleges "was never proposed for termination and was never fired . . . despite having criminal charges and a PBJ." (*Id.* ¶ 79.) Curry also focuses on Brandon Johnson ("Johnson"), another male correctional officer whom Curry alleges was "on AWOL" and engaged in "several altercations" at the correctional academy but was not dismissed. (*Id.*)

Curry's claim for disparate treatment with respect to Epps and Johnson fails because she has not shown that she was similarly situated to them. Warden Price, who was responsible for Curry's 2000 termination, was not the warden when Epps received a PBJ on March 22, 2001. (Def.'s Mot. to Dismiss, Ex. 4, Att. E.) As recently articulated by the Fourth Circuit, "[i]f different decision-makers are involved, employees are generally not similarly situated." *Forrest v. Transit Mgmt. of Charlotte, Inc.*, No. 06-2245, 2007 WL 2348698, slip op. at *2 (4th Cir. Aug. 15, 2007) (concluding that because African-American male transit worker alleging Title VII race discrimination for disparate treatment with respect to disciplinary measures failed to provide for

14

"adequate comparison" between two decision-makers, different outcomes "unpersuasive").

Curry's claim for disparate treatment fails with respect to Johnson because he was, in fact,

dismissed from the correctional academy on July 16, 2004 for, inter alia, appearance issues and

persistent tardiness. (Def.'s Mot. to Dismiss, Ex. 6, Att. A.)

### B. Count II – Hostile Work Environment

To establish a hostile work environment claim, a plaintiff must show that: (1) the

harassment was unwelcome; (2) the harassment was based on her gender or national origin; (3)

the harassment was sufficiently severe or pervasive to alter the conditions of employment and

create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.

*See Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006).

Curry's hostile work environment claim fails primarily because she has neither alleged

nor shown that any of the "hostility" that she experienced was based on her gender, though she

has had more than one opportunity to amend her complaint to make such an allegation or

showing. For this reason alone, Curry's claim is barred.

Curry's hostile work environment claim also fails because she has not shown that the

harassment that she experienced caused an "abusive atmosphere." The examples that Curry

provides in her Complaint – including the "cold stare" that Curry allegedly received on June 8,

2004 (Third Am. Compl. ¶ 40); the denial of having the pants of her correctional officer uniform

exchanged on August 20, 2004 and overhearing that a supervisor would not be "kissing her ass"

(*Id.* ¶ 46); and, on September 28, 2004, hearing a supervisor yell at a male officer whose uniform

Curry was adjusting to dress himself[13] (*Id*. ¶ 49) – do not sustain a hostile work environment claim.

At best, Curry has demonstrated that neither her supervisors nor her immediate co-workers liked her. Indeed, even the OAH, in reviewing Curry's 2000 termination and concluding that Curry had been a victim of retaliation by the "circle of friends" of the lieutenant whom Curry had spurned and on whose opinions Curry's supervisors relied in evaluating Curry, observed that Curry "did not endear herself to that group of her supervisors." (Third Am. Compl., Ex. 1 at 17.) However, not liking or being liked by one's supervisors or co-workers does not create a viable hostile work environment claim. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) ("Even if [the employee] harbored some personal dislike of [the plaintiff] that make [the plaintiff's] job more difficult or stressful, an employer is not required to like his employees." (citation and internal quotation marks omitted)). While it may be that Curry's supervisors "disliked [Curry] and made her job more stressful as a result, that fact . . . is not sufficient to establish a prima facie claim." *Gilliam v. South Carolina Dept. of Juvenile Justice*, 474 F.3d 134, 143 (4th Cir. 2007) (concluding that race-based Title VII hostile work environment claim brought by African-American nurse against white male supervisor who allegedly assaulted her by grabbing her arm and caused her to feel "terrified" at work failed because of lack of evidence supporting race-based hostility).

---

[13] Curry takes the position that the August 20, 2004 remark was a "gender based comment" that Warden Price did not "investigate" or "remedy." (Third. Am. Compl. ¶ 91.) Curry contends that the order for the male officer to dress himself "insinuat[ed] that [Curry] might file sexual harassment charges" against this officer and that Warden Price did not "investigate" or "remedy" the insinuation. (Third. Am. Compl. ¶ 92.) However, as recognized by the Supreme Court, Title VII was not intended to become a "general civility" code and the high standards for judging hostility are "sufficiently demanding to . . . filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 288 (1998) (citation omitted).

### C. Count III – Retaliation

To establish a claim of retaliation under Title VII, a plaintiff must show: (1) that she engaged in protected activity; (2) that the employer took an adverse action against her; and (3) that a causal connection existed between the protected activity and the adverse action. *Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 271 (4th Cir. 2001). A court, upon finding a prima facie case has been established, must then determine whether the defendant has offered a legitimate and non-retaliatory reason for the action, which the plaintiff may rebut by showing that the reason is a pretext for retaliation. *See Matvia*, 259 F.3d at 272-73. The Supreme Court has clarified that Title VII's anti-retaliatory provision only applies to employer actions "that would have been materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* --- U.S. ---, 126 S.Ct. 2405, 2414 (2006) (citation and quotation marks omitted).

Curry's retaliation claim fails because she is unable to establish a prima facie case. Upon close examination, the examples that Curry cites for support of her retaliation claim – her 2004 termination (Third Am. Compl. ¶ 44); not being allowed to take sick leave on December 15, 2005 (*Id*. ¶ 56); being denied access to the EEOC office of the MRDCC on January 18, 2006 (*Id*. ¶ 60); having a jail door allegedly closed on her hand on January 27, 2006 (*Id*. ¶ 62); and being "delayed" her recertification without sufficient explanation (*Id*. ¶ 60) – do not implicate "employer interference with 'unfettered access' to Title VII's remedial mechanisms." *White,* --- U.S. ---, 126 S.Ct. 2405, 2415.

Curry first fails to establish a prima facie case for retaliation because she has not demonstrated a causal connection between her June 16, 2004 complaint to the EEOC (EEOC No. 120-2004-04454) and her termination on October 29, 2004. As Curry herself acknowledges,

Warden Price planned a disciplinary meeting with Curry before she filed her EEOC charge and had agreed to postpone disciplinary measures on her criminal charges until after they were adjudicated. (Third Am. Compl. ¶¶ 41, 42.)

Second, Curry has failed to show how her denied request to use sick leave on December 15, 2005 was materially adverse.  (*Id*. ¶ 56.) "An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). Title VII's "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *White,* --- U.S. ---, 126 S.Ct. 2405, 2414. Curry has not shown that she was injured based on the denial of sick leave or prevented from filing further EEOC claims, which she in fact did on December 15, 2005 (EEOC No. 120-2006-00984) and October 24, 2006 (EEOC No. 531-2006-02498).

Third, with respect to Curry's allegation that she was denied access to the EEOC office of the MRDCC, Curry has failed to show interference with "unfettered access" to Title VII remedies or rebut the explanation provided by the State. Warden Price states in his affidavit that, once he learned that the assistant warden of MRDCC had formerly been a security chief at MCI-J during the time that Curry was there and alleged Title VII violations, he directed Curry's complaints to be directed to him or the Minority Business Enterprise/Equal Employment Opportunity Division, a separate unit of the MRDCC. (Def.'s Mot. to Dismiss, Ex. 3, Price Aff. ¶ 22.) Even assuming the redirection of Curry's EEOC complaints was materially adverse, given that Curry was still provided with an alternative channel for her EEOC complaints and she has failed to show pretext on the part of the State, her retaliation claim here fails.

18

Fourth, concerning the jail door that Curry allegedly had closed on her hand on January 27, 2006, as egregious as this action is, it does not constitute a materially adverse employment action. As stated by this court, a "discriminatory animus cannot be inferred from conduct of supervisors which a plaintiff may deem to be inconsiderate." *Sharafeldin v. Maryland*, 121 F. Supp. 2d 730, 739 (D. Md. 2001) (concluding that there was no Title VII "discriminatory harassment" in "physical confrontation" between African-American state prison chaplain of Sudanese descent and his superior, and there was no evidence the action was based on chaplain's race, religion, or national origin) (citing *Settle v. Baltimore County,* 34 F. Supp. 2d 969, 991 (D. Md. 1999)). Furthermore, "Title VII does not prohibit all verbal or physical harassment in the work place . . . ." *Id.* (quoting *Oncale v. Sundowner Offshore Svcs., Inc.,* 523 U.S. 75, 80 (1998)).

Fifth, that Curry's recertification to become a correctional officer did not officially occur until January 8, 2007, even though she completed her correctional academy training on August 1, 2006, does not by itself establish retaliation. The record shows only that there were certain bureaucratic procedures associated with getting Curry's recertification approved – e.g., submitting updated background information concerning Curry's criminal charges in accordance with the Maryland Code of Regulations – and as soon as these procedures were completed, Curry was certified as a correctional officer. *See* Md. Code Regs. 12.10.01.08.D (correctional entity must forward "criminal history and derogatory information" to the Maryland Correctional Training Commission).

In short, I find that most of the discriminatory conduct that Curry alleges took place does not implicate adverse employment actions under Title VII. Further, when Curry has been able to imply an adverse employment action, she is unable to establish a prima facie case for her

disparate treatment, hostile work environment, and retaliation claims or, when applicable,

demonstrate pretext.

A separate order effectuating the rulings made in this memorandum is being entered

herewith.


Date: September 17, 2007                    /s/_____
                                           J. Frederick Motz
                                           United States District Judge